# Exhibit A

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE:  STANFORD ENTITIES SECURITIES LITIGATION | MDL No. 2099 |

**NOTICE OF POTENTIAL
TAG-ALONG ACTION**

Pursuant to Rule 7.1(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation and the U.S. Judicial Panel on Multidistrict Litigation's (the "MDL Panel") October 6, 2009 Order, attached hereto as Exhibit A, transferring for pretrial purposes all actions concerning the Stanford Securities Litigation, the Plaintiff listed on the attached Schedule of Actions hereby provides notice of a potential "tag-along" action pending in the District of New Jersey that is related to actions, wherein Defendant Pershing, LLC ("Pershing") is a party, which have been transferred pursuant to 28 U.S.C. § 1407.

Plaintiff respectfully submits that this action involves common questions of fact with the actions that have been transferred pursuant to Section 1407, and should be considered a "tag-along" action pursuant to Rule 7.1(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation. The docket sheet and complaint are attached hereto as Exhibit B.

Dated: November 17, 2015

/s/ Lindsey H. Taylor
LINDSEY H. TAYLOR

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
ltaylor@carellabyrne.com

Attorneys for Plaintiff T. Denny Sanford

## SCHEDULE OF ACTIONS

|  | Plaintiffs | Defendant | District | Civil Action No | Judge |
|---|---|---|---|---|---|
| **1.** | T. Denny Sanford | Pershing LLC | D.N.J. | 15-7820 | Judge Susan D. Wigenton |

2

## PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that copies of the foregoing document were served on all parties electronically via ECF on November 16, 2015.

/s/ Lindsey H. Taylor
LINDSEY H. TAYLOR

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
ltaylor@carellabyrne.com

Attorneys for Plaintiff T. Denny Sanford

3

# Exhibit A



CERTIFIED A TRUE COPY
KAREN MITCHELL, CLERK

By s/ THOMAS DREW
DEPUTY CLERK
U.S. DISTRICT COURT, NORTHERN
DISTRICT OF TEXAS

January 30, 2014

**UNITED STATES JUDICIAL PANEL**
on
**MULTIDISTRICT LITIGATION**

IN RE: STANFORD ENTITIES SECURITIES
LITIGATION                                                    MDL No. 2099

(SEE ATTACHED SCHEDULE)

**CONDITIONAL TRANSFER ORDER (CTO −10)**

On October 6, 2009, the Panel transferred 4 civil action(s) to the United States District Court for the Northern District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. §1407. *See* 655 F.Supp.2d 1360 (J.P.M.L. 2009). Since that time, 21 additional action(s) have been transferred to the Northern District of Texas. With the consent of that court, all such actions have been assigned to the Honorable David C Godbey.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Northern District of Texas and assigned to Judge Godbey.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the action(s) on the attached schedule are transferred under 28 U.S.C. §1407 to the Northern District of Texas for the reasons stated in the order of October 6, 2009, and, with the consent of that court, assigned to the Honorable David C Godbey.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Northern District of Texas. The transmittal of this order to said Clerk shall be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 7−day period, the stay will be continued until further order of the Panel.

| |
|---|
| Inasmuch as no objection is pending at this time, the stay is lifted. |
| **Jan 30, 2014** |
| CLERK'S OFFICE<br>UNITED STATES<br>JUDICIAL PANEL ON<br>MULTIDISTRICT LITIGATION |

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

**IN RE: STANFORD ENTITIES SECURITIES
LITIGATION**

MDL No. 2099

### SCHEDULE CTO−10 − TAG−ALONG ACTIONS

| **DIST** | **DIV.** | **C.A.NO.** | **CASE CAPTION** |
|---|---|---|---|

FLORIDA SOUTHERN

| FLS | 1 | 13−24210 | Weatherly et al v. Pershing, LLC |

# Exhibit B

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
### CIVIL DOCKET FOR CASE #: 2:15-cv-07820-SDW-LDW

SANFORD v. PERSHING, LLC
Assigned to: Judge Susan D. Wigenton
Referred to: Magistrate Judge Leda D. Wettre
Cause: 28:1332 Diversity-Fraud

Date Filed: 10/30/2015
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**T. DENNY SANFORD**

represented by **JAMES E. CECCHI**
CARELLA BYRNE CECCHI OLSTEIN
BRODY & AGNELLO, P.C.
5 BECKER FARM ROAD
ROSELAND, NJ 07068
(973) 994-1700
Fax: (973) 994-1744
Email: jcecchi@carellabyrne.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**PERSHING, LLC**

represented by **PHILIP ANDREW GOLDSTEIN**
MCGUIRE WOODS LLP
1345 AVENUE OF THE AMERICAS
7TH FLOOR
NEW YORK, NY 10105-0106
212-548-2167
Email: pagoldstein@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/30/2015 | 1 | COMPLAINT against PERSHING, LLC ( Filing and Admin fee $ 400 receipt number 0312-6730279) with JURY DEMAND, filed by T. DENNY SANFORD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(seb) (Entered: 11/02/2015) |
| 11/02/2015 | 2 | SUMMONS ISSUED as to PERSHING, LLC Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. Issued By *STEPHEN BOND* (seb) (Entered: 11/02/2015) |
| 11/11/2015 | 3 | NOTICE of Appearance by PHILIP ANDREW GOLDSTEIN on behalf of |

PERSHING, LLC (GOLDSTEIN, PHILIP) (Entered: 11/11/2015)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/16/2015 09:32:13 | | | |
| **PACER Login:** | hc0097:2559504:0 | **Client Code:** | 7000 |
| **Description:** | Docket Report | **Search Criteria:** | 2:15-cv-07820-SDW-LDW Start date: 1/1/1970 End date: 11/16/2015 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, Florida 33143
(305) 357-9000

Scott D. Hirsch, Esq.
Charles E. Scarlett, Esq.
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Ste. 200
Boca Raton, Florida 33434
(561) 278-6707

Robert C. Gilbert, Esq.
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, Florida 33134
(305) 384-7270

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| T. DENNY SANFORD,<br><br>     Plaintiff,<br><br>vs.<br><br>PERSHING, LLC,<br><br>     Defendant. | Civil Action No.<br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff T. Denny Sanford, by way of Complaint against Defendant Pershing, LLC, says:

## PARTIES

1. Plaintiff, T. Denny Sanford is a citizen of South Dakota residing in Sioux Falls, South Dakota. Plaintiff purchased a SIBL certificate of deposit in May 2005 in the amount of $5 million and a SIBL certificate of deposit in June 2007 in the amount of $10 million.

2. Defendant, Pershing, LLC ("Pershing"), is a Delaware limited liability company, with its principal place of business at 1 Pershing Plaza, Jersey City, New Jersey, 07399. The sole member of Pershing LLC is Pershing Group LLC (a Delaware LLC with its principal place of business in New Jersey) and the sole member of Pershing Group LLC is The Bank of New

York Mellon Corporation (a Delaware corporation with its principal place of business in New York).

## VENUE AND JURISDICTION

3. This Court has general diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity between Plaintiff is a citizen of a different State than Pershing.

4. Venue is proper in the United States District Court in and for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(1) as it is the judicial district in which the defendant resides.

## FACTUAL ALLEGATIONS

### A.    Introduction

5. On February 17, 2009, the FINRA broker/dealer solely owned by Allen Stanford, Stanford Group Company ("SGC"), and solely owned Antiguan bank, Stanford Bank International, Ltd. ("SIBL"), were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws by their intricate involvement in the second largest Ponzi scheme in American history.

6. Despite numerous red flags, including knowledge that the Securities and Exchange Commission ("SEC") was investigating the sales practices related to the SIBL certificate of deposit ("CD") in 2005, Pershing entered into a clearing agreement on December 27, 2005 with SGC and rendered material assistance to the Allen Stanford Ponzi scheme from 2005 through February 17, 2009. ███████████████████████ ███████████████ As a result, investors who purchased CDs issued by SIBL lost $7.2 billion. The magnitude of the Stanford Ponzi scheme would have been impossible to achieve

2

Case 2:15-cv-07820-SDW-LDW Document 1 Filed 10/30/15 Page 3 of 32 PageID: 3

without Pershing's material and indispensible aid in growing SGC and, in turn, substantially increasing the sales of the SIBL CDs. Pershing's assistance extended far beyond the ministerial functions of clearing trades and wiring funds to purchase CDs, and, as a result, Pershing facilitated the increase of sales of SIBL CDs from approximately $2.8 billion at the end of 2005 (during an approximately 10 year period) to more than $7.2 billion by the end of 2008.

7.      Despite SGC's absolute dependence on the 3% referral fees for CD sales paid by SIBL and on Allen Stanford's continual infusion of cash to maintain the broker-dealer's staggering overhead, Pershing never obtained answers to critical questions that members of its senior management repeatedly articulated as the minimum necessary to determine the legitimacy of the entire Stanford business model anchored by the revenues generated by the sale of CDs. Pershing Executives attempted to meet privately with Stanford Executives as its



Regardless, Pershing never discovered:

- The underlying assets for the purported investment portfolio of SIBL;

- The identity of the money managers for the purported investment portfolio of SIBL;

- How the money managers sustained an annualized return sufficient to cover the 3% referral fees and the overhead of SIBL despite volatile, and for the most part, down global markets;

- Allen Stanford's source of wealth that funded SGC with more than $165,000,000 necessary to make up the consecutive quarterly losses of SGC; and

- Proof that Allen Stanford's "wealth" even existed so as to be able to continue to infuse cash to SGC.

Case 2:15-cv-07820-SDW-LDW Document 1 Filed 10/30/15 Page 4 of 32 PageID: 4

8.      Pershing never received answers to any of these questions for the entire three and one-half year period, yet continued to provide vital services to the Stanford entities.  Pershing also knew that SIBL was audited by a one-man accounting firm in Antigua (highly abnormal for this type and size of investment vehicle). Pershing knew the SEC was also investigating Stanford Financial Group ("SFG"), another wholly owned Allen Stanford company.  During the period in which Pershing provided these services, Pershing knew Stanford was subject to virtually nonexistent regulation in Antigua.  These facts, combined with the extended period of time Pershing allowed Stanford to ignore and simply refuse to respond to its repeated questions, are more than sufficient to support the reasonable inference that Pershing had a "general awareness" of Stanford's underlying wrongdoing.  Pershing rendered substantial assistance to Stanford by exercising professional expertise and judgment, all of which was motivated by its own financial interests as well as the financial interests of Stanford.

**B.      Pershing Shed its Rule 382 Protection**

9.      New York Stock Exchange ("NYSE") Rule 382 allowed an introducing broker to enter into a contract with a clearing broker, wherein the clearing agreement between the introducing broker and clearing firm must specify the respective functions and responsibilities of each party.[1]  Essentially, NYSE Rule 382 protected clearing firms from liability for an introducing firm's conduct provided that the clearing firm performed *only* the ministerial functions delineated in the clearing agreement.  By way of example, NYSE Rule 382 absolved a clearing broker from liability if the clearing firm:

- Provided only "back-office" services;

---

[1]      NYSE Rule 382, though in existence at the time of the Stanford Ponzi scheme, has been replaced by FINRA Rule 4311.

4

- Provided processing and administrative services in connection with securities transactions;

- Played no role in the introducing firm's sales activities;

- Involved itself in a transaction only *after* a trade had been ordered or otherwise authorized by the customer.

10.      Pershing manifestly disregarded the well-settled principles regarding clearing firm liability by materially participating in and aiding and abetting Stanford's wrongdoing.[2]



█████ Pershing maintained a close relationship with Stanford, acknowledged repeatedly by Pershing's Senior Executives as a ████████████ and ████████████ that defied the industry standard for a clearing broker. Pershing referenced its partnership with Stanford not only internally, but also in direct communications with Stanford recruits and Stanford personnel. Pershing held itself out as Stanford's ████████████ in addition to Stanford's clearing firm, a dual role that distinguishes between the processing vendor function of a clearing firm and the trusted business partner function that Pershing engaged in. For example, in order to obtain Stanford's business, Pershing differentiated itself from other clearing brokers ████████████ by its commitment to a strategic business partnership approach as opposed to a role as simply a clearing firm. ████████████

████████████

12.      Pershing removed itself from any possible protection of NYSE Rule 382 by engaging in the following actions:

---

[2]      On December 8, 2014, United States District Judge David Godbey in the Northern District of Texas assigned to oversee the class action, *Turk v. Pershing, L.L.C.*, Civ. Act. No. 3:09-CV-2199-N (N.D. Tex. 2009), and related litigation, ruled that Pershing is <u>not</u> entitled to blanket immunity as a clearing broker and <u>can</u> be held liable as such. A true and correct copy is attached as Exhibit "C." This determination is consistent with the Court's Order in *Kneese v. Pershing, L.L.C.*, Civ. Act. No. 3:10-CV-1908-N (N.D. Tex. 2010), *See* Nov. 14, 2014 Order [21] 8-10 ("*Kneese* Order"). A true and correct copy is attached as Exhibit "D."

5

Case 2:13-cv-07820-SDW-LDW Document 1 Filed 10/30/13 Page 8 of 32 PageID: 8

- Initiating the recruitment of Financial Advisors ("FAs") for SGC even <u>prior</u> to entering into a contractual relationship with SGC and during its relationship by selling the Pershing/Bank of New York relationship and putting on the ███████ ████ to lend reputational enhancement to Stanford;

- Giving assurances to both recruits and already recruited FAs that Pershing had completed a thorough due diligence on Stanford to eliminate any apprehension that the FAs had about recommending the CD product to their clients despite insufficient or non-existent due diligence;

- Attending and participating in Top Producers Club ("TPC") meetings in which brokers who sold at least $2 million in SIBL CDs were given a "reward trip";

- Exercising professional judgment about whether to accept orders for processing and whether to execute transactions in customer accounts; and

- Ensuring that the introducing broker was meeting net capital and other regulatory requirements.

13.    Moreover, Pershing provided the following additional services that extended beyond the permissible functions and responsibilities allocated to Pershing as a clearing firm:

- Leveraging the Bank of New York Mellon Wealth Management team for private banking products such as lines of credit, standby letters of credit, aircraft loans, unsecured credit, and other lending alternatives;

- Securities Based Lending Solutions, including CreditAdvance, a margin lending product, LoanAdvance, a consumer lending product, RealAdvance, a mortgage solution offered by Bank of New York Mortgage Solutions LLC, and Collateral Monitoring Service;

- Wrap Account Services, including money manager services (buying and selling securities);

- Sales and marketing functions on the broker interface NetExchange Pro;

- Money Management Research (pre-transaction information); and

- Financial Planning Software.

14.    As a result, because Pershing moved well beyond performing routine clearing functions that are post-transactional, ministerial, administrative, and mechanical, Pershing is no

6

longer subject to the protection of NYSE Rule 382 and therefore can and should be held liable for the Plaintiff's losses.

### C. The Pershing-Stanford Relationship

15. In May 2005, Pershing began discussions with Stanford management about taking over the role as the custodian and clearing firm for SGC. Stanford cleared with Bear Stearns, and had continually done so, since SGC began business in 1996.

16. In 2005, Stanford decided to embark on an ambitious and challenging growth plan for SGC to add over 100 new FAs and to open numerous new branch offices around the world. The anticipated growth of SGC was the impetus for the Pershing-Stanford relationship. Prior to teaming up with Pershing, Stanford explained its expansion plan that included looking for a strategic partner to assist Stanford in its growth. Pershing desired to be that partner.

17. One of the earliest meetings between Pershing and Stanford personnel took place at Pershing's headquarters at Pershing Plaza in New Jersey. Pershing's senior management was involved in forging the relationship with Stanford. Claire Santaniello, Pershing's Chief Compliance Officer, and John Ward, its Relationship Manager, were two of the principals involved in the New Jersey meeting. At the outset, Stanford wanted the credibility of having a relationship with a firm like Pershing. As demonstrated below, that credibility, or "reputational enhancement," of Pershing was absolutely critical and was called upon time and time again to recruit FAs and grow SGC, and likewise to increase the sale of the SIBL-issued CDs. Pershing was more than willing to give legitimacy to the Stanford enterprise in exchange for SGC's business.

18. Eager for Stanford's business, beginning in mid-2005, Pershing commenced its due diligence on Stanford, which essentially proved to be no due diligence at all. One of

7

Pershing's expressed goals in conducting due diligence into the Stanford-related companies was to rule out fraud, but because its due diligence was superficial and grossly incompetent (questions asked but never answered), the possibility of fraud was ever-present throughout the three and one-half year relationship. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ his is simply false.

19. Pershing performed perfunctory due diligence on the Stanford companies (including SIBL and the ▮▮▮▮ of the Stanford enterprise, the SIBL CD) despite the fact that the clearing agreement signed by Pershing and SGC and Pershing's ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Additionally, Pershing was required to

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pershing was also aware of countless badges of probable criminal activity before and during its relationship with Stanford including:

- Allen Stanford's history of owning a bank on the Island of Montserrat, a known haven for money launderers;

Case 2:15-cv-07820-SDW-LDW Document 1 Filed 10/30/15 Page 9 of 32 PageID: 9

- Stanford moving his bank to the Island of Antigua, with its dubious money laundering history;

- Allen Stanford's push to relax anti-money laundering regulations in Antigua;

- Knowledge of the SEC's investigation in 2005 into the sale of the CDs;

- ████████████████████████████████████████████████████

- ████████████████████████████████████████████████████

- Various news articles that reported investigations by the SEC into the CDs sold by SIBL during the period of time that Pershing was wiring cash to offshore banks where SIBL owned accounts; and

- ████████████████████████████████████████████████████

20. Although SGC was a United States-based NASD member firm, its affiliation with offshore banks, trust companies and broker-dealers with mostly non-US clients was a stated concern to Pershing. Moreover, because Pershing viewed Stanford as a very large prospect, it felt the need to have ████████████████████ In sum, Pershing acknowledged that while Pershing was not directly doing business in Antigua, it was partnering with an entity that received the majority of its revenue from an offshore Antiguan bank.

████ Throughout the "due diligence" process, Pershing became aware of numerous troubling facts about Allen Stanford and the Stanford business model. ████████████████

████████████████████████████████████████████████████

22. Many Pershing employees that shared concerns about SIBL and the CDs misrepresented the existence of internal questions to their superiors and to third parties, stating that they were both satisfied and comfortable with the Stanford entities and the CD product in

9

order to maintain the ever-growing and highly profitable relationship with Stanford. ▇▇▇ ▇▇ Indeed, there was internal turmoil between the credit risk department and the relationship management/sales departments over the apparent "red flags" concerning Stanford.

### D.     Pershing Played an Integral Role in Defrauding Over 18,000 Victims

23.     Pershing rendered material assistance to the Allen Stanford Ponzi scheme by growing SGC, resulting in $7.2 billion in losses to those investors who purchased SIBL CDs. As discussed above, Pershing's assistance went far beyond clearing trades and transferring funds for the purchase of CDs. Pershing took many steps to help grow SGC which resulted in a large increase in sales of the SIBL-issued CDs to investors.

### a.     Pershing was Motivated by the Opportunity to Clear $4.5 Billion in Assets

24.     From the outset, Pershing was driven by its intense focus upon appropriating more than $4.5 billion in assets cleared by SGC's previous clearing firm, Bear Stearns. Pershing did so despite not only the existence of numerous red flags of highly suspicious activity, but also Pershing Senior Executives' growing suspicions of the existence of fraud by Stanford.

25.     Pershing worked hard to grow SGC in order to obtain the rest of the accounts that Bear Stearns still had in late 2006. Early on in Pershing's discussions with SGC (mid-2005), Pershing recognized that the ▇▇▇▇▇ for SGC's business model was the SIBL-issued CD offered to investors throughout the world. It is, therefore, no coincidence that sales of the CDs exploded with Pershing at Stanford's side. From 2005 through the end of 2008, SIBL reported that its CD deposits had increased from $2.8 billion to more than $7.2 billion. (By comparison, it took 15 years – from 1986 through 2001 – for deposits to reach $1 billion.)

10

### b. Pershing Ignored the Red Flags and Disregarded Corporate Policy

26. Throughout its relationship with Stanford, Pershing discovered numerous red flags that required it to, at a minimum, re-evaluate its relationship with Stanford (prudently, it should have immediately terminated the relationship). Yet, Pershing carried on business as usual. For example, Pershing discovered that:

- Allen Stanford forfeited more than $3 million in deposits it held in his bank on the Island of Montserrat that were linked to a Mexican drug lord;



- Pershing had never seen the investment portfolio maintained by SIBL;

- The people running SGC did not know the composition of the SIBL portfolio;

- Essentially, the entire SIBL portfolio was managed by Allen Stanford's right-hand man, James Davis, and Laura Pendergest-Holt, neither of whom had the education or training to manage such a massive portfolio;

- The financial condition and financial statement of SIBL were audited by a one-man accounting firm in Antigua, C.A.S. Hewlett & Co., Ltd. – an accounting firm that no one at Pershing had ever heard of;

- Financial regulators in Antigua (the Financial Services Regulatory Commission, or "FSRC") had no work papers or documentation supporting the assets that SIBL claimed to own;

- It was the regular practice of the FSRC to just accept at face value whatever SIBL and Allen Stanford told the FSRC about its financial condition and portfolio values; and

- Unlike anything Pershing had seen before, SIBL showed a profit in good times and bad.

11

Case 2:15-cv-07820-SDW-LDW   Document 1   Filed 10/30/15   Page 12 of 32 PageID: 12

█████ As a result of these mounting red flags and the lack of disclosure and transparency from Stanford, in early 2008, Pershing requested that SGC hire a third-party accounting firm to validate the balance sheets from SGC and SIBL.  Pershing broached this subject with SGC on many occasions, however, SGC never agreed.

12

Case 2:15-cv-07820-SDW-LDW   Document 1   Filed 10/30/15   Page 13 of 32 PageID: 13



13

Case 2:15-cv-07820-SDW-LDW  Document 1  Filed 10/30/15  Page 24 of 82 PageID: 14



35.     Notably, Pershing's Chief Compliance Officer, who was also a member of the IEDDC and Pershing's Credit Committee, was not responsible for ensuring that Pershing followed such policies.   Rather, the relationship management team, or sales force, was

Case 2:15-cv-07820-SDW-LDW Document 1 Filed 10/30/15 Page 15 of 32 PageID: 15

responsible for the periodic review of Stanford. Yet the relationship management team's role with respect to Stanford was to advocate for Stanford. Pershing enlisted the very employees who worked to secure the relationship with Stanford (despite all the red flags) to be responsible for reviewing Stanford's activity and to determine whether it was suspicious. Moreover, Pershing's Credit Committee and/or Compliance Department should have assessed the relationship management's periodic review of Stanford due to Stanford's higher risk, yet that never occurred. The Chief Compliance Officer was neither familiar with, nor did she verify, the exact process the relationship management team engaged in to review and approve Stanford on a periodic basis. In fact, it is doubtful that any such mandatory review ever took place.

       **c.**     **Pershing and Stanford Engaged in a** ▮▮▮▮▮

36. Pershing often described its relationship with Stanford as a ▮▮▮▮▮ and worked tirelessly to help grow the Stanford business. Pershing was willing to be a partner with SGC and assist in the growth of SGC as its ▮▮▮▮▮



▮▮▮▮▮ In fact, Pershing was willing to be in a ▮▮▮▮▮ with Stanford.

       **d.**     **Pershing Recruited Stanford's Financial**
              **Advisors**

37. From 2005 through February 17, 2009, Pershing played a central role in recruiting preeminent FAs for SGC. Notably, Pershing recruited FAs for SGC even *before* the clearing agreement was even executed. Much of Stanford's growth during this time came from a focused effort to recruit top talent from major brokerage firms. Prior to working at SGC, this select group of FAs had successful careers with valued clients. Pershing understood that recruiting

15

FAs was critical to growing SGC and SIBL, and that the acquisition of FAs with large books of business was the most efficient way to gain assets. It was common knowledge to Pershing that a certain percentage of assets brought over by the FAs to SGC would be used to purchase SIBL CDs.

38.     As part of the recruiting process, FAs were often invited to the Stanford Houston office for presentations intended to entice them to work at SGC. Pershing personnel, including relationship management executives, participated in the recruiting sessions. A typical recruiting session would be held at Stanford headquarters where the recruits would receive an agenda comprised of scheduled meetings with Stanford personnel as well as specific meetings with Pershing personnel. Often times, a Pershing relationship management executive would attend recruiting meetings as the sole Pershing representative, despite the individual's lack of subject matter expertise on Pershing's technology/operational systems. The relationship management team attended the recruiting meetings simply to sell the ███████████ and to provide a perspective of the █████████████████████ of Pershing/Bank of New York. ███████████ ████████████████████████████████████████ If Pershing personnel were unavailable to attend the meetings in person, recruits would be escorted into a conference room to conduct a telephone conference with the relationship management team at Pershing.

39.     During recruiting meetings, Pershing would engage in reputational enhancement by supporting Stanford with the Pershing name and the name of its parent company, Bank of New York. Not only would the recruits get to work with Pershing once they joined Stanford, but Pershing would also ████████████████ i.e., Pershing and the Bank of New York. To the recruits, many of whom had never heard of Stanford before, the support and endorsement by Pershing and the Bank of New York gave instant credibility to the Stanford enterprise. Pershing

16

even admitted to recruits that while Stanford did not have a prominent name in the financial community, its partnership with Pershing/Bank of New York would provide the necessary reputational confirmation to attract clients.

40.     Pershing's name and reputation were invaluable to Stanford. Pershing was known for being reliable and had a history of working only with first-rate broker/dealers. Pershing touted itself as having a name that was synonymous with high quality clearing and execution in the industry. Thus, its strength in endorsing Stanford was critical to any recruit coming from a wire house to a smaller firm. Some recruits expressed excitement about working with a big name like Pershing because of its gravitas and access to resources. Consequently, Pershing's representations carried a tremendous amount of weight and were an integral part of the FAs' decision to work at Stanford.

41.     When anyone at Pershing was questioned about its relationship with SIBL, Pershing unequivocally represented to recruits that it had completed its due diligence on Stanford, including SIBL. In fact, Pershing informed FAs that the due diligence process for Stanford took longer than average due to the vetting process for SIBL. Although the SIBL CDs were not on its platform, Pershing represented that it completed due diligence on SIBL because it was part of the Stanford business and Pershing was transferring customers' funds to the Bank for the purchase of CDs. Moreover, Pershing vouched for the SIBL CDs as legitimate investments. Pershing withheld the fact that, internally, it had open questions about SIBL and the CDs that SIBL issued. Moreover, as Pershing's concerns grew, it never retracted its endorsement of Stanford and the CDs.

17

Case 2:15-cv-07820-SDW-LDW   Document 1   Filed 10/30/15   Page 18 of 32 PageID: 18

42.     Based on Pershing's assurances regarding SIBL and support of the CD product, FAs not only recommended investing in the CDs to their clients, but also many FAs personally purchased the CDs and advised their family members to do so as well.

43.     An example of Pershing's involvement in recruiting, with a laser focus on growing SGC and thus the SIBL CDs, was evident in the Stanford Miami office. The Stanford Miami office was registered with the NASD (later FINRA) as an Office of Supervisory Jurisdiction. Accordingly, the Miami office was charged with supervision and compliance oversight of all Stanford Latin America branch offices. Stanford Miami was a unique office in that it was comprised of both SGC brokers and Stanford Fiduciary Investor Services ("SFIS") trust representatives. The SFIS trust representatives sold only SIBL CDs, while the SGC employees sold SIBL CDs along with other investments. Although Pershing only cleared the SGC transactions, Pershing was aware that the Miami office was the hub for Latin America and that the SFIS trust representatives were top CD sellers (and invitees of TPC meetings as discussed below). When Pershing executives visited the Miami office, they would often attempt to entice the SFIS trust representatives to get their securities licenses in order to recruit them to join SGC.

44.     Even after financial advisors were recruited, Pershing executives continued to validate the Stanford enterprise as they attended the TPC meetings, in which brokers who sold at least $2 million in SIBL CDs in any given quarter were given a "reward trip." The TPC meetings were strictly for advisors who did business with SIBL (SGC business was irrelevant). Nevertheless, Pershing attended the SIBL-only conferences because Pershing wanted to support and grow the Bank's CD business.

18

> **e.   Pershing Provided Assurances Directly to FAs and Investors**

45.     The ongoing assurance of Pershing's relationship with Stanford was a comforting factor in investors' decisions to buy and hold CDs.  The FAs and investors did not have the same degree of access into the bank's portfolio as did Pershing, in theory.  Being told that Pershing had transparency into the bank and was "satisfied" with everything it saw validated the CD program in the eyes of the FAs, assuaged any concerns they might have had, and encouraged the FAs to sell more CDs or recommend that their clients hold existing CDs.  Although FAs were recruited across the country and at different periods of time, they were told nearly identical stories about Pershing's due diligence on Stanford and were given the same sales pitch that Pershing fully backed Stanford, SIBL, and the SIBL CDs.

46.     Pershing assured the FAs that it did its investigation on Stanford and was pleased with the results.  If not, it would have never become Stanford's partner and lend Stanford its name and reputation.  The Pershing investigation, as represented, included travelling to Antigua to visit SIBL on more than one occasion.  After "diving deeply" into SIBL's portfolio, Pershing proclaimed that it was pleased with Stanford's transparency and was very comfortable with the portfolio.  However, this representation to the FAs was false.  Pershing further boasted that SIBL provided a unique product for brokers to sell to their clients, but never informed the FAs that Pershing had numerous open questions about the CD and never retracted its endorsement as its concerns increased.

47.     Pershing reassured the customers of SGC with communications to the FAs designed to reach the investor. Significantly, two representations from Pershing induced holders of the CDs to refrain from redeeming.  First, a mass email was sent on behalf of Pershing's CEO, Richard Brueckner, on October 3, 2008, to all FAs of SGC containing "key facts and

19

Case 2:15-cv-07820-SDW-LDW   Document 4-1   Filed 10/30/15   Page 20 of 82 PageID: 108

information" about Pershing and Bank of New York and their "strong position" to protect clients' assets and mentioning both Securities Investor Protection Corporation and Customer Asset Protection Company. A true and correct copy of the 10/03/08 email is attached hereto as Exhibit "I." The intent of this email blast was to assuage any concerns of SGC FAs during the roiling markets of October 2008. It was also designed to consist of a "comfort email," intended to be disseminated to the customers of each FA so as to prevent market hysteria. A "Pershing Bulletin" dated December 12, 2008 was also designed to reach the SGC customer in the same manner and for the same purpose. ███████████████████████████ The "Pershing Bulletin" included a form letter that the SGC FAs could send to each of his or her customers. Pershing, however, failed to alert the investors of the numerous suspicious circumstances it had long been concerned about. Neither the comfort email nor the bulletin put investors on notice that the CDs were not covered by any of the touted insurance or the financial wherewithal of either Pershing or the Bank of New York.

### f.    Pershing Senior Executive Senses Fraud Immediately

48. Richard Closs is a Senior Executive hired by Pershing in May 2006 as a credit risk manager. Immediately upon his arrival, he was assigned to conduct an independent review of the SIBL/SGC relationship in order to obtain answers to critical questions that remained outstanding six months after the contract between SGC and Pershing was executed.

49. Initially, Closs focused Pershing Executives upon the many unanswered questions that were raised from the outset in mid-2005 when the Senior Relationship Manager, John Ward, Global Chief Compliance Officer, Claire Santaniello, and Pershing Attorney, George Arnett, travelled to Antigua for the purpose of conducting due diligence on SIBL.

50. The goal of Closs' independent review was to identify and verify the source of funds that were supporting SGC in the form of "referral fees." Specifically, there was concern at Pershing regarding SGC's reliance on the referral fees paid to SGC by SIBL because approximately 60% of SGC's total revenue was produced from the commissions generated by the sales of the SIBL-issued CDs. Throughout his years of experience, ████████████████ ████████████████████████████████████ Closs was also concerned that as SGC continued to lose money, more capital infusions to support SGC by Allen Stanford (as the sole shareholder) would be necessary. Pershing did not know the source and had never verified any aspect of Allen Stanford's purported wealth.

51. Accordingly, Closs asked for information from Stanford that included, but was not limited to, the following:

- Detail for the source of capital that was used to support the continued losses of SGC;

- Allen Stanford's personal financial statement;

- SGC's projection for revenue growth, capitalization, and continued pay-outs to attract new brokers;

- The investment vehicles that SIBL utilized in managing the portfolio created with the CD proceeds;

- Statements verifying the holdings by outside funds and audited statements of internalized investment options;

- The capacity of SIBL to attract new deposits;

- Maintenance of the high level of return consistently paid on the CDs; and

- Contingency plans should there be a drastic reduction in sales of the CD product and the resulting referral fees.

██████ In the summer of 2006, Closs was especially concerned that Pershing did not have any knowledge of the source of Allen Stanford's wealth. Despite repeated requests by Pershing,

21

Case 2:15-cv-07820-SDW-LDW   Document 1   Filed 10/30/15   Page 22 of 32 PageID: 22

SGC refused to produce Allen Stanford's personal financial statement.



53.     After approximately three months at Pershing (and still no answers), Closs' concerns grew.  His concerns stemmed from Stanford's failure to provide transparency and outright refusal to share pertinent information.  Because Pershing never received answers to its questions that were designed to rule out fraud, the possibility of Stanford's fraud continued to exist.  Despite all of this, Pershing continued to move ahead and conduct business as usual with SGC.

54.



55.

56.     Following the call, Pershing executives decided to keep Close on a ▮▮▮▮▮ and away from Pendergest-Holt because his questions created ▮▮▮▮▮ at Stanford and could have jeopardized the budding and highly profitable relationship. ▮▮▮▮▮ ▮▮▮▮▮ A Pershing Senior Executive, John Ward, described the Close/Pendergest-Holt telephone conversation ▮▮▮▮▮ ▮▮▮▮▮ in order to prevent Close from having further access to Pendergest-Holt or anyone at Stanford. ▮▮▮▮▮ ▮▮▮▮▮ In reality, Close was simply trying to get answers to his questions and did not agree with the unjustified criticism he received as a result of the call.  Incredibly, when Pendergest-Holt was invited to visit Pershing three weeks later for ▮▮▮▮▮ Close was not included in any meetings, in fact he was never even told she was coming, missing another opportunity to get his questions answered.

57.     During this time, Claire Santaniello, the Global Chief Compliance Officer ("GCCO") and a member of Pershing's Credit Committee, the Risk Management Steering Committee, the IEDDC, the Suspicious Activity Review and Oversight Committee, and

23

Case 2:15-cv-07820-SDW-LDW   Document 4-1   Filed 11/18/15   Page 34 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW   Document 1-1   Filed 10/30/15   Page 24 of 32 PageID: 24
112

eventually Pershing's Executive Committee, knew that Close had a list of critical questions that needed to be answered. Inexplicably, however, Santaniello let two and a half years pass without ever following up with Close to find out if Pershing had received answers to its outstanding questions despite working with Close and interacting with him on a daily basis.

58.     In August 2007, Pershing Senior Executives met with Stanford Senior Executives to discuss Pershing's continuing concerns.  Again, they did not get any answers.  In yet another attempt to obtain information, Close, Ward and Arnett travelled to Antigua in January 2008 to meet with the regulators of Antigua, FRSC, and the auditor of SIBL, the one-person auditing firm, to review the work papers and the audit of SIBL and its assets.  As Close waited to board the plane for the trip to SIBL, Arnett and Ward informed him that the auditor was not going to be present in Antigua, a fact that they knew much earlier and would have caused Close to cancel the trip had he known in advance. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████ It does not.

59.     By early 2008, after nearly two years of Close' independent review, Pershing still did not have the answers to its critical questions.  In February, 2008 Pershing proposed an independent third-party conduct an audit on SIBL, but it never occurred.  During the summer of 2008, news broke that Stanford was under investigation by the SEC.  By November of that year, Stanford informed Pershing that it would not provide an audited financial statement for Allen Stanford, nor would it acquiesce to Pershing's request to verify the underlying assets.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Case 2:15-cv-07820-SDW-LDW   Document 1   Filed 10/30/15   Page 25 of 32 PageID 25



61.     After three years of Stanford's failure to provide transparency and answers to its questions, Pershing executives chose not to terminate the relationship with Stanford.  Instead, on December 12, 2008, the day after Bernie Madoff's arrest, Pershing executives held a second meeting and voted to only terminate the wires to the offshore accounts so as to "incentivize" Stanford to finally provide the information that Pershing had been requesting.  Pershing did not follow through with that decision and let the wiring of funds continue for another month longer, allowing millions of dollars from customer accounts to be sent to SIBL for the purchase of more bogus CDs.

62.



Case 2:15-cv-07820-SDW-LDW Document 1 Filed 10/30/15 Page 26 of 32 PageID: 114

63.     Pershing wanted to ensure that if Stanford turned out to be running a Ponzi scheme like Bernie Madoff, its exposure was limited, but it took no action whatsoever to protect any investors.

**E.      Pershing Does Anything It Can To Maintain Its Relationship With Stanford.**

64.



In early January 2009, the relationship management team actually re-introduced Stanford's request that it had made earlier in 2008 for a re-pricing of Pershing's fees charged for various clearing services.  In essence, Stanford was asking Pershing to lower its fees and charges to Stanford as an accommodation for its growing "business opportunity" that it was providing to Pershing.  Previously, in the spring of 2008, Stanford was notified by Pershing that no re-pricing would even be considered until all of the long-outstanding questions were completely answered and Pershing was comfortable with Stanford's CD business.



As a result of Pershing's decision to stop the wiring of funds to Stanford's offshore accounts used to purchase the CDs, Pershing executives actually believed that stopping the wires provided a "path forward" to continuing its profitable relationship with Stanford.  Because Pershing was concerned that the termination of

26

the wires could adversely impact its relationship with Stanford, the decision was made at Pershing to not only grant Stanford's request for a re-pricing of Pershing services, but also to provide Stanford with a contract extension. Pershing had learned that Stanford considered terminating Pershing and hiring another clearing firm or making an attempt to become a self-clearing firm.

66.     Finally, despite never receiving answers to any of its critical questions for over three years, being lied to by numerous Stanford executives and officers about its business, business practices, and inability to answer certain questions, Stanford's complete lack of transparency in general, countless suspicious activities which raised serious concerns within key departments at Pershing, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pershing elected to continue its relationship with Stanford and to "conduct business as usual."

67.     In fact, in early February 2009, just two weeks prior to the SEC's raid on Stanford headquarters, Pershing confirmed its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ through its willingness to re-price its fees and to provide Stanford with a contract extension, thus assuring Stanford that the re-pricing would provide Stanford with more money to use for its recruiting efforts, which would consequently bring in more assets and accounts to be cleared by Pershing. This plan was a ▮▮▮▮▮▮▮▮▮▮▮ for both Stanford and Pershing. ▮▮▮▮▮▮

██████████████████████████████████ In short, despite everything that occurred, the only obstacle that stopped Pershing from continuing with its partnership with Stanford was the February 17, 2009 raid of Stanford's headquarters by federal authorities that shut Stanford down. Pershing's willingness and desire to remain Stanford's loyal partner continued until that day.

## COUNT ONE
### PARTICIPATION IN BREACH OF FIDUCIARY DUTY

68.     Plaintiff repeats the allegations set forth in Paragraphs 1 through 67 above as if fully set forth herein.

69.     As an SEC registered investment advisor and as a NASD/FINRA registered broker/dealer, SGC owed fiduciary duties to the Plaintiff as a matter of law. SGC breached its fiduciary duties by advising Plaintiff to invest in the SIBL-issued CDs because the CD investments were imprudent and unsuitable for any investor and because SGC was financially incentivized by SIBL to recommend the CDs, a non-conventional private placement, to its customers. SGC did not have sufficient knowledge in its possession with respect to the bona fides of SIBL, its creditworthiness, the risks and rewards associated with the CD that SIBL issued, the CD's liquidity or interest rate risks and the factors that determine those risks. SGC also breached its fiduciary duties even though it lacked sufficient information regarding the investment portfolio created by SIBL with the proceeds from the sale of the CDs or the money managers who invested and managed the portfolio,

70.     Pershing knew that SGC owed fiduciary duties to the Plaintiff as mandated by law and it knew that SGC was breaching those duties as described herein. With full knowledge of the pervasive breaches by SGC, Pershing conspired with and substantially aided and abetted and otherwise participated in SGC's breaches. Pershing's substantial participation in breaches of

28

fiduciary duties is a proximate cause of actual damages to the Plaintiff. Pershing knew or should have known that its substantial aiding and abetting and participation in the breaches of fiduciary duties as set out above would result in extraordinary harm to the Plaintiff.

71.     Plaintiff seeks an award against Pershing of actual damages.

## COUNT TWO
## FRAUD

72.     Plaintiff repeats the allegations contained in Paragraphs 1 through 71 above as if fully set forth herein.

73.     Pershing defrauded Plaintiff because it possessed a general awareness that its role was part of an overall activity that was improper. Pershing was aware of a number of red flags concerning the CDs issued by SIBL yet continued to provide services to the Stanford entities including SGC. For example, Pershing knew that SIBL was audited only by a one-man accounting on the Island of Antigua and that this was abnormal for an investment portfolio the size of which was purportedly owned by SIBL.

74.     Pershing's general awareness was also based on the fact that Pershing knew that the SEC was investigating the Stanford Financial Group during the period of time that Pershing was providing services to SGC; that Pershing knew that Stanford was subject to virtually nonexistent regulation in Antigua; that Pershing continued to lobby SGC to procure an audit from a reputable auditing firm yet was consistently delayed and/or refused; and that the numerous red flags remained unanswered for many months during Pershing and SGC's relationship.

75.     Pershing also defrauded the investors of SGC, including the Plaintiff named herein, by making fraudulent statements to the SGC FAs that Pershing intended to be relayed to the FAs' customers. These fraudulent communications included, but were not limited to,

29

advising FAs and prospective FAs that Pershing had completed its due diligence into SIBL and the CDs SIBL issued and gave them both its stamp of approval; the statements by the Chief Executive Officer of Pershing contained in a blast email in October 2008 to the FAs of SGC advising them to remain calm in a turbulent stock market because of Pershing's financial strength and the financial strength of its parent company, Bank of New York Mellon; and sending a "Pershing Bulletin" in December 2008 to the FAs with a form letter for the FAs to send to their SGC customers advising them of the financial strength of Pershing and Bank of New York Mellon and that the customers' assets were covered by other forms of insurance.

76.     The general awareness by Pershing of the above described factors imputes specific knowledge by Pershing of wrongdoing by Stanford which is tantamount to scienter and forms the basis for this common law fraud cause of action.

77.     Plaintiff seeks an award against Pershing of actual damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant for:

a.     Rescission, including consideration paid for the CDs plus interest earned thereon from the date of payment; and

b.     Actual damages, including applicable interest; and

c.     Such other relief as the Court may deem just.

<div style="text-align:right">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By:____/s/ James E. Cecchi_____
          JAMES E. CECCHI

</div>

Dated:  October 30, 2015

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515

Case 2:15-cv-07820-SDW-LDW   Document 4-1   Filed 11/18/15   Page 41 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW   Document 1   Filed 10/30/15   Page 31 of 32 PageID: 31
119

South Miami, Florida 33143
(305) 357-9000

Scott D. Hirsch, Esq.
Charles E. Scarlett, Esq.
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Ste. 200
Boca Raton, Florida 33434
(561) 278-6707

Robert C. Gilbert, Esq.
KOPELOWITZ OSTROW
 FERGUSON WEISELBERG GILBERT
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, Florida 33134
(305) 384-7270

## JURY DEMAND

The undersigned hereby demands a trial by jury as to all issues so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By:   /s/ James E. Cecchi
      JAMES E. CECCHI

Dated:  October 30, 2015

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, Florida 33143
(305) 357-9000

Scott D. Hirsch, Esq.
Charles E. Scarlett, Esq.
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Ste. 200
Boca Raton, Florida 33434
(561) 278-6707

Robert C. Gilbert, Esq.
KOPELOWITZ OSTROW
 FERGUSON WEISELBERG GILBERT
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, Florida 33134
(305) 384-7270

32

Case 2:15-cv-07820-SDW-LDW   Document 1-1   Filed 10/30/15   Page 1 of 1 PageID: 33

# EXHIBIT A

# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 1-2   Filed 10/30/15   Page 1 of 1 PageID: 34

# EXHIBIT B
# [REDACTED]

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LYNNE TURK, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-2199-N |
| | § | |
| PERSHING LLC, *et al.*, | § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses Defendant Pershing LLC's ("Pershing") motion to dismiss Plaintiffs' amended consolidated complaint [84]. For the following reasons, the Court grants in part and denies in part Pershing's motion.

### I. THE PARTIES' DISPUTE

This suit is one of many to arise out of the ongoing Receivership proceeding against R. Allen Stanford, his associates, and various entities under his control (collectively, "Stanford"). Plaintiffs are former investors in Stanford's enterprise, who reside in both Florida and Texas. They bring this action against Pershing, a financial services firm that they allege served as custodian and clearing broker for the Stanford Group Company ("SGC"), Stanford's Houston broker–dealer. Essentially, Plaintiffs argue that in providing these services to SGC, and thus facilitating SGC's sale of the fraudulent Stanford International Bank Limited ("SIBL") certificates of deposit, Pershing incurred liability stemming from Stanford's own wrongdoing. Specifically, Plaintiffs bring claims for (1) participation in a

ORDER – PAGE 1

breach of fiduciary duty, (2) aiding and abetting various violations of the Texas Securities Act ("TSA"), (3) participation or aid in violation of the Florida Securities Investor Protection Act ("FSIPA"), and (4) negligence/gross negligence. Pershing now moves to dismiss, alleging that as a clearing broker it is too far removed from the underlying wrongdoing to be held liable, and that Plaintiffs have inadequately pled their claims. The Court agrees in part.

## II. THE RULE 12(b)(6) STANDARD

When faced with a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

## III. PERSHING CAN BE HELD LIABLE AS A CLEARING BROKER

Pershing asserts as a threshold argument that clearing brokers are sufficiently removed from any underlying misconduct that they cannot be held liable for their clients' wrongdoing. *See, e.g., McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002) ("It is well-settled that, when a clearing firm acts merely as a clearing agent, it owes no fiduciary duty to the customers of its introducing broker and cannot be held liable for the acts of an introducing firm."). However, other courts have extended liability to clearing brokers where the clearing broker went beyond the provision of mere ministerial or clerical services. *See, e.g., Klein v. Oppenheimer & Co., Inc.,* 130 P. 3d 569, 588 (Kan. 2006). Indeed, this Court previously held in a similar action filed against Pershing that it was not entitled to blanket immunity as a clearing broker. *See* Nov. 14, 2014 Order [21] 8–10 ("*Kneese* Order"), in *Kneese v. Pershing, L.L.C.,* Civ. Act. No. 3:10-CV-1908-N (N.D. Tex. filed Sept. 23, 2010). There, this Court held that dismissal was inappropriate where plaintiffs alleged Pershing performed "more than *routine* financing," "made assessments about *whether* to process orders and execute transactions," and "used professional expertise and discretion." *Id.* at 10 (emphases in original).

Here, Plaintiffs reiterate many of the same allegations found in *Kneese* and thus avoid Pershing's assertion of blanket immunity. For instance, Plaintiffs allege Pershing had discretion over "whether or not to accept an order for processing, whether to execute a transaction in a customer account," and was responsible for "ensuring that the introducing broker was meeting net capital and other regulatory requirements." Am. Consolidated

Case 3:09-cv-02199-N-BG   Document 125   Filed 12/08/14   Page 4 of 13   PageID 2107

Compl. ("ACC") ¶ 62.  Plaintiffs thus make sufficient allegations that, when accepted as true, establish Pershing provided services to SGC that were more than routine or ministerial.  The Court thus finds Pershing's role as a clearing broker is no impediment to imposing liability.

## IV. THE PLAINTIFFS' TSA CLAIMS

Article 581-33F(2) of the TSA provides that "a person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under [various provisions of the TSA] jointly and severally with the seller, buyer, or issuer, and to the same extent as if her were the seller, buyer, or issuer." TEX. REV. CIV. ST. ANN. art. 581-33F(2).  Thus, to state a claim Plaintiffs must allege (1) a primary violation of the securities laws occurred; (2) the aider and abettor intended to deceive the plaintiff or was at least perceived a risk that its assistance would facilitate the primary violation, *see Sterling Trust Co. v. Adderly*, 168 S.W.3d 835, 837 (Tex. 2005); and (3) the aider and abettor rendered "substantial assistance" or "material aid" in the primary violation.

### A. Plaintiffs Plead Three Primary Violations

Plaintiffs allege three primary violations of the TSA: (1) that Stanford sold unregistered securities in violation of article 581-33(A)(1); (2) that Stanford sold securities while unregistered as a dealer in violation of article 581-33(A)(1); and (3) that Stanford sold securities by means of an untruth or omission in violation of article 581-33(A)(2). Pershing does not challenge the sufficiency of Plaintiffs' pleadings as to the primary violations.

ORDER – PAGE 4

Case 2:15-cv-07820-SDW-LDW    Document 4-1    Filed 11/18/15    Page 49 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW    Document 1-3    Filed 10/30/15    Page 5 of 13 PageID: 59
127

Accordingly, the Court holds Plaintiffs have sufficiently pled the three underlying primary violations.

### B. Plaintiffs Adequately Plead Scienter

To state a claim for aiding and abetting under the TSA, a plaintiff must allege facts establishing the aider and abettor has a "general awareness that his role was part of an overall activity that is improper." *Adderley*, 168 S.W.3d at 840.[1] The Court finds Plaintiffs have adequately alleged this general awareness. Plaintiffs allege Pershing was aware of a number of red flags and continued to provide services to Stanford entities. For example, Plaintiffs allege Pershing knew that SGC was consistently audited by a one-man accounting firm based in Antigua, and that this was abnormal for investment funds. ACC ¶¶ 52, 53. Plaintiffs allege Pershing knew that the SEC was investigating Stanford Financial Group during the period in which they provided services. *Id.* ¶ 57. They allege Pershing knew Stanford was subject to virtually nonexistent regulation in Antigua. *Id.* ¶ 74. Indeed, one of the overarching narratives of the ACC – that Pershing continued to lobby SGC to procure an audit from a reputable accounting firm – tends to, when viewed in a light most favorable to Plaintiffs, establish Pershing knew something about Stanford was not right. When combined with the extended period of time Pershing allowed Stanford to defer its requests, *see id.* ¶ 83,

---

[1] By *Adderley*'s plain language, a plaintiff need not plead general awareness as to each of the underlying primary violations. A general awareness of involvement in the primary violator's overall wrongdoing is sufficient to establish scienter for each of the three alleged violations. *See Kneese* Order 7–8 (considering general awareness of wrongdoing when analyzing scienter requirement as to two alleged primary violations). Thus, Pershing's arguments that Plaintiffs fail to allege specific knowledge of the TSA registration requirements or Stanford's violation of them is unavailing.

Case 3:09-cv-02199-N-BG   Document 125   Filed 12/08/14   Page 6 of 13   PageID 2109

Plaintiffs have alleged enough to support the reasonable inference that Pershing had a "general awareness" of Stanford's underlying wrongdoing.

### C. Plaintiffs Adequately Plead Substantial Assistance

Under the TSA, an aider is one who "materially aids a seller, buyer or issuer of a security." TEX. REV. CIV. ST. ANN. art. 581-33F(2). Texas courts have interpreted this language to require that one "substantially assist" a primary violation in order to be held liable. *See, e.g., Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 720–21 (Tex. App. – Houston [14th Dist.] 2010, no pet.).

The Court's reasoning in the *Kneese* Order is instructive here. There, the Court found that Plaintiffs adequately pled substantial assistance by alleging that "Pershing exercised professional expertise and judgment, motivated by its own financial interests, as well as the financial interests of the Stanford Defendants." *Kneese* Order 8. Here, as there, Plaintiffs allege Pershing engaged in acts that were more than ministerial, including exercising professional judgment about whether to accept orders for processing and whether to execute transactions in customer accounts, and ensuring the introducing broker was meeting net capital and other regulatory requirements. ACC ¶ 62. Plaintiffs also allege that Pershing provided margin financing to investors for the purchase of Stanford CDs. *Id.* ¶ 65. Pursuant to the *Kneese* Order's reasoning, the Court finds sufficient allegations to conclude Plaintiffs adequately plead substantial assistance.

Pershing's attempt to distinguish *Kneese* is unavailing. Pershing asks the Court to disregard *Kneese* because there the Plaintiffs each had investment accounts that were

allegedly serviced by Pershing, while the class here is not so limited.[2]  First, this is a fact question more properly decided on a motion for summary judgment or at the class certification stage. *See, e.g., BookLocker.com, Inc. v. Amazon.com, Inc.,* 650 F. Supp. 2d 89, 97 n.3 (D.Me. 2009) (noting that when considering a motion to dismiss prior to class certification, only the named plaintiffs' claims are before the Court).  Second, Pershing fails to explain why having an account that was serviced by Pershing would be necessary to bring aiding and abetting TSA claims against Pershing.  Pershing's role in the success of the scheme is hardly different for an individual whose account was serviced by Pershing than it is for one who suffered collaterally as a result of Pershing's alleged involvement.  Pershing advances no compelling argument as to why its secondary liability should be limited to those investors whose accounts Pershing serviced.

In sum, Plaintiffs adequately plead their claims for secondary violations of the TSA. They sufficiently allege the three primary violations, as well as Pershing's scienter and substantial assistance.  The Court accordingly denies Pershing's motion to dismiss Plaintiffs' claims for aiding and abetting violation of the TSA.

---

[2]This argument was raised in a September 5, 2014 correspondence filed with the Court.  Although the correspondence was not officially filed with the Clerk of Court, both parties filed similar letters and counsel of record for both parties were made aware of the respective filings.

ORDER – PAGE 7

## V. The Plaintiffs' FSIPA Claims

Plaintiffs bring claims for secondary liability under the Florida Securities and Investor Protection Act based on Stanford's sale of unregistered securities in violation of Florida Statutes § 517.07. The FSIPA provides:

> Each person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security.

FLA. STAT. § 517.211(1). Thus, to state a claim for secondary liability, a plaintiff must allege (1) a primary violation; (2) that the alleged aider is a director, officer, partner, or agent of the seller; and (3) that the aider personally participated or aided in making the sale. *Id.* Because Plaintiffs fail to allege the third element, the Court dismisses Plaintiffs' FSIPA claims.

### A. Plaintiffs Fail to Plead Personal Participation or Aid

Florida Courts have interpreted the personal participation or aid element to "impl[y] some activity in inducing the purchaser to invest." *Nichols v. Yandre*, 9 So. 2d 157, 160 (Fla. 1942); *see also* 32 FLA. JUR. 2d *Investment Securities* § 241 ("In order for an officer, director, or agent of the seller to be held personally liable for the sale of illegal securities, he or she must engage in some act or acts that induce the purchaser to invest."). Though *Nichols* is dated, it continues to be cited favorably by both federal and state courts in Florida. *See Groom v. Bank of America*, 2012 WL 50250, at *5 (M.D. Fla. 2012); *Dillon v. Axxsys Int'l, Inc.*, 385 F. Supp. 2d 1307, 1311 (M.D. Fla. 2005); *Ruden v. Medalie*, 294 So. 2d 403, 406 (Fla. Dist. Ct. App. 1974).

Plaintiffs urge the Court to depart from *Nichols*, arguing the inducement requirement is dicta, that *Nichols* failed to distinguish "participation in" and "aid," and that similar blue sky laws do not require inducement. The Court disagrees with Plaintiffs' reading of *Nichols*. Although the plaintiff in *Nichols* relied on the "participation in" prong, the Court's unequivocal holding as to the meaning of "personal participation or aid" was that the language as a whole "implies some activity in inducing the purchaser to invest . . . ." 9 So. 2d at 160. The plain language of *Nichols* requires inducement, and other Florida courts have followed it as such. Moreover, while analogous blue sky laws may be helpful in construing the FSIPA, there is no reason to do so when there is a valid Florida Supreme Court case on point. The FSIPA requires inducement for imposition of secondary liability.

Plaintiffs fail to plead any conduct that could be construed as inducement. Their complaint is based on a theory of liability applicable to Pershing as a behind-the-scenes actor in Stanford's scheme. Nowhere do Plaintiffs allege that Pershing had any meaningful interfacing with Stanford investors or that it was at all active at the point of purchase of CDs. Indeed, Plaintiffs' response to Pershing's motion to dismiss does not attempt to identify any conduct that could qualify as inducement. Accordingly, the Court finds that Plaintiffs fail to plead a secondary violation of the FSIPA and dismisses that claim.

### VI. THE COURT GRANTS PERSHING'S MOTION TO DISMISS PLAINTIFFS' NEGLIGENCE CLAIMS

To state a claim for negligence, a plaintiff must allege three elements: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from that breach. *E.g., Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). The existence

of a legal duty is a threshold question, *id.*, and is a question of law for the court to resolve. *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387 (Tex. 1991). If no duty exists, then the negligence claim is not viable and the Court need not consider the remaining elements. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998).

Pershing asserts that as a clearing broker, it owed no common law duty of care to Plaintiffs that could form the basis of a negligence claim. The majority of case law supports Pershing's contention. *See, e.g., Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) (holding a clearing broker owes no fiduciary duty to investors); *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002) (same); *Riggs v. Schappell*, 939 F. Supp. 321, 329–30 (D.N.J. 1996) (same). *Riggs* is particularly instructive because there, the court refused to create a duty of care from alleged violations of securities laws. 939 F. Supp. at 329–32. Thus there is no duty of care on which Plaintiffs can base their negligence claim.

Plaintiffs fail to cite any cases to the contrary. Plaintiffs do list a series of cases in which courts permitted claims to go forward against clearing brokers where it was alleged the clearing broker went beyond the provision of merely ministerial services. *See* Pls.' Resp. 37–38 [86]. However, each of Plaintiffs' proffered cases pertains to the maintenance of claims based on violations of various securities laws, not on the existence of a duty of care supporting a negligence claim. In other words, there is a meaningful distinction between a clearing broker's amenability to suit for statutory violations on one hand, and the existence of an independent duty supporting a negligence claim on the other. As previously discussed, providing services that are more than ministerial may indeed expose a clearing broker to

Case 2:15-cv-07820-SDW-LDW    Document 4-1    Filed 11/18/15    Page 55 of 82 PageID: 45
Case 2:15-cv-07820-SDW-LDW    Document 133    Filed 10/30/15    Page 11 of 13    PageID: 133

Case 3:09-cv-02199-N-BG    Document 125    Filed 12/08/14    Page 11 of 13    PageID 2114

statutory liability. But Plaintiffs' cited cases do not support their contention that provision of such services also creates an independent duty of care. Having found no duty of care sufficient to support a claim for negligence, the Court dismisses Plaintiffs' negligence claims.[3]

## VII The Court Denies Pershing's Motion To Dismiss Plaintiffs' Claim for Participation in Breach of Fiduciary Duty

To state a claim for participation in breach of fiduciary duty, Plaintiffs must allege facts establishing: (1) the existence of a fiduciary relationship; (2) Pershing's knowledge of the fiduciary relationship; and (3) Pershing's awareness that it was participating in the breach of the fiduciary duty. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Texas Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721 (Tex. App. – Austin 2001, pet. denied). Plaintiffs adequately plead each element of this claim.[4]

Pershing first argues it cannot be held liable because it was not aware of the Stanford entities' breaches of their fiduciary duties. Yet Plaintiffs make a number of allegations that,

---

[3]The Court notes that it reaches a different result here than was reached on plaintiffs' negligence claims in this Court's December 5, 2014 Order 30–31 [64], *in Janvey v. Willis of Colorado, Inc.*, No. 3:13-CV-3980-N (N.D. Tex. filed Oct. 1, 2013). The discrepancy is a result of the alleged actions supporting the respective negligence claims. In *Janvey v. Willis*, the insurance brokers were alleged to have provided insurance coverage letters to Stanford, knowing they would be distributed to investors. Here, there is no allegation Pershing had any similar interfacing with investors such that a duty of care would arise.

[4]Pershing does not contest that the Stanford entities owed investors fiduciary duties, or that at the time Pershing knew of the existence of this fiduciary duty. Rather, Pershing argues it was not aware of the Stanford entities' breach, and that it did not render "substantial assistance" to the breach. Accordingly, the Court considers only the final element of the claim.

ORDER – PAGE 11

when viewed in a light most favorable to Plaintiffs, support a reasonable inference that Pershing knew of the underlying fiduciary breaches. For instance, Plaintiffs allege that Pershing knew the Stanford entities were under SEC investigation, ACC ¶ 68, and that the SIBL securities consistently received above market returns, *id.* ¶ 54. Plaintiffs also allege Pershing had access to SGC's financial statements, which revealed that SGC was dependent on revenue from the sale of SIBL CDs, and would have been insolvent without those revenues and other capital contributions from Stanford and his entities. *Id.* ¶¶ 50, 52, 55. Those allegations, in combination with allegations that Pershing consistently and for an extended period of time requested that SGC receive a reputable audit, support the inference that Pershing knew SGC was violating its duties to investors.

Pershing also argues that it cannot be liable because its contribution to the underlying breach was not "substantial." As an initial matter, there remains a question as to whether this is even a requirement for pleading a "participation in" claim. Pershing cites *Woloshen v. State Farm Lloyds*, 2008 WL 4133386, at *2 n.3 (N.D. Tex. 2008), which noted confusion as to whether "participation in" is functionally equivalent to "aiding and abetting," a theory of liability that does require "substantial assistance," *see, e.g., W. Fork Advisors, LLC v. SubGuard Consulting Servs., LLC*, 437 S.W.3d 917, 921 (Tex. App. – Dallas 2014, pet. filed). Nevertheless, the Court finds the distinction irrelevant here because, as previously discussed, Plaintiffs allege enough facts to support a finding of "substantial assistance." *See supra* Part IV.C. Thus, having alleged Pershing was both aware of Stanford's underlying breach of fiduciary duties and continued to provide "substantial assistance" to SGC, the

Court finds Plaintiffs have adequately stated a claim for participation in breach of fiduciary duty.

## CONCLUSION

The Court denies Pershing's motion to dismiss as to Plaintiffs' claims for aiding and abetting breaches of the TSA and for participation in breach of fiduciary duties. The Court grants Pershing's motion and dismisses Plaintiffs' claims for secondary violation of the FSIPA and for common law negligence. Because the Court finds amendment would be futile as to these claims, the Court dismisses them with prejudice.

Signed December 8, 2014.

David C. Godbey
United States District Judge

ORDER – PAGE 13

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CAROLYN KNEESE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-1908-N |
| | § | |
| PERSHING, L.L.C., | § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses Defendant Pershing L.L.C.'s motion to dismiss [6]. Because Plaintiffs[1] sufficiently state their aiding and abetting claims, the Court denies the motion.

### I. PLAINTIFFS' SECURITIES DISPUTE

This action relates to the Securities and Exchange Commission's (the "SEC") ongoing securities fraud action against R. Allen Stanford, his associates, and various entities under Stanford's control (the "Stanford Defendants"). The Stanford Defendants allegedly swindled billions of dollars from investors through an elaborate and international Ponzi scheme. As part of that litigation, this Court "assume[d] exclusive jurisdiction and t[ook] possession of the" "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *in SEC v. Stanford Int'l Bank, Ltd.*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009).

---

[1]The plaintiffs in this action are Carolyn Kneese, Albert and Cynthia Gordon, Michael and Linda Eisemann, Carolina Sfeir, and Diego Bustamante.

ORDER – PAGE 1

Plaintiffs here purchased certificates of deposit ("CDs") issued by Stanford International Bank Ltd. ("SIB") through SIB's affiliated U.S. broker-dealers, the Stanford Group Company ("SGC") and Stanford Capital Managements ("SCM"). Defendant Pershing LLC ("Pershing") acted as a clearing broker for SGC from December 2005 until December 2008. Plaintiffs allege that Pershing aided and abetted Stanford in selling unregistered securities in violation of the Texas Securities Act ("TSA"). TEX. REV. CIT. STAT. art. 581-1, *et seq.* Pershing now moves to dismiss, alleging that the Plaintiffs' complaint fails to state a claim, *see* FED. R. CIV. P. 12(b)(6); and fails to state fraud claims with particularity. *See* FED. R. CIV P. 9(b).

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(6) Standard

When faced with a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). According to the Supreme Court, a viable complaint must include "enough facts to state a claim to relief that is plausible on its face," i.e., "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the claim or element. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). A plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

ORDER – PAGE 2

Case 2:15-cv-07820-SDW-LDW Document 1-4 Filed 10/30/15 Page 3 of 11 PageID: 50



The Supreme Court has observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*,] 490 F.3d 143, 157-158 [(2d Cir. 2007)]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).
>
> In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949-50.

In ruling on a Rule 12(b)(6) motion, the Court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

*B. Rule 9(b) Standard*

For claims based on fraud, a complaint must allege the fraudulent circumstances with particularity. FED. R. CIV. P. 9(b). In the Fifth Circuit, Rule 9(b) requires a plaintiff to plead

the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (alteration in original).

## III. PLAINTIFFS STATE A VIABLE CLAIM

Article 581-33F(2) of the Texas Securities Act provides that "a person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under [various provisions of the TSA] jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer." Thus, to prove a violation, Plaintiffs must show that: (1) a primary violation of the securities laws occurred; (2) the aider and abettor intended to deceive the plaintiff, or, at least was "subjectively aware of the primary violator's improper activity"[2]; and (3) the aider and abettor rendered "substantial assistance" or "material aid" in the primary violation.[3] Although federal securities law does not have a corresponding

---

[2]In *Sterling Trust Co. v. Adderley*, the Texas Supreme Court held that the statute's "reckless disregard for the truth" language contemplated subjective awareness of the improper activity. 168 S.W. 3d 835, 837 (Tex. 2005).

[3]Texas cases state that Texas law requires that a person "substantially assist" a primary violation. *Frank v. Bear, Sterns & Co.*, 11 S.W.3d 380, 374 (Tex. App. – Houston [14th Dist.] 2000, pet. denied). Yet the Texas statute requires that an aider and abettor "materially aid" a primary violation, not substantially assist. TEX. CIV. STAT. art. 581-33F(2). The Texas Supreme Court has never applied the "materially aid" requirement of the statute, so the Court does not know if this semantic distinction makes any meaningful difference. But the Court notes that state courts have relied upon similar distinctions to distinguish federal aiding and abetting case law. *See Klein v. Oppenheimer & Co., Inc.*, 130 P.3d 569, 588 (Kan. 2006). Nevertheless, the Court will consider federal caselaw because Texas state courts do.

ORDER – PAGE 4

aiding and abetting statute,[4] Texas courts have looked to federal case law in other contexts. *Star Supply Co. v. Jones*, 665 S.W.2d 194 (Tex. App. – San Antonio 1984, no writ) (citing *Searsy v. Comm. Trading Corp.*, 560 S.W.2d 637 (Tex. 1997)). And in the aiding and abetting context, it appears that Texas courts derived their test from the test applied in federal aiding and abetting claims.[5] Accordingly, the Court will look to federal law for guidance. But because many states have enacted substantially similar aiding and abetting statutes, the Court will look to caselaw from those states as well. *See, e.g., Klein v. Oppenheimer & Co., Inc.*, 130 P.3d 569, 588-89 (Kan. 2006).

### A. Plaintiffs Have Sufficiently Pled Two Primary Violations

To prove an article 33-F(2) claim, a plaintiff must prove a primary violation of the TSA. Plaintiffs allege two separate violations: (1) that Stanford sold unregistered securities in violation of article 581-33(A)(1); and (2) that Stanford sold his CDs by means of an untruth or omission in violation of article 581-33(A)(2). The Court finds that Plaintiffs have

---

[4] *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 576, 608 (S.D. Tex. 2003). Historically, federal courts permitted buyers of securities to bring claims against aiders and abettors of securities fraud under federal law. But by its decision in *Central Bank of Denver v. First Interstate Bank of Denver*, the Supreme Court ended this type of claim. 511 U.S. 164. Pershing is correct that the SEC may still bring aiding and abetting claims, but the Court notes that the elements of such claims may have changed. *See SEC v. Apuzzo*, 689 F.3d 204, 206 (holding that proof of substantial assistance is different in SEC actions).

[5] In *Frank v. Bear, Sterns & Co.*, the court of appeals stated for the first time that the elements of a Texas aiding and abetting claim under article 33-F(2) required substantial assistance of the violation. 11 S.W.3d 380, 374 (Tex. App. – Houston [14th Dist.] 2000, pet. denied). In doing so, the court relied on a law review article that, at least in so far as it listed "substantial assistance" as a requirement under the Texas statute, relied upon a Fifth Circuit case applying the federal law. *See* Keith A. Rowley, *The Sky is Still Blue in Texas: State Law Alternatives to Federal Securities Remedies*, 50 BAYLOR L. REV. 99, 182 (1998) (citing *Abbott v. Equity Group Inc.*, 2 F.3d 613, 621 (5th Cir. 1993)).

ORDER – PAGE 5

sufficiently pled both primary violations.

*1. Plaintiffs Have Pled a Primary Violation for Selling Unregistered Securities.* – In Texas, prior to issuing a security, a person must register or otherwise acquire a permit to sell from the Commissioner. TEX. CIV. STAT. art. 581-7. However, there are exceptions to this rule. Plaintiffs allege that SIB security offerings were not registered — a claim that Pershing does not dispute — and that SIB claimed its securities were exempt from registration under the private offering exemption. Under Texas law, that exemption is available only if the issuer of a security sells the security to thirty-five or fewer investors and does so without public solicitation. *Id.* art. 581-5. Plaintiffs allege that the Stanford securities were not registered and further allege that SGC sold the CDs though general solicitation through print media, television advertisements, and seminars to thousands of offerees. Assuming the truth of these allegations, the private offering exemption obviously would not apply. Accordingly, the Court finds that Plaintiffs have sufficiently pled a primary violation that Stanford sold unregistered securities in violation of the Texas Securities Act.

*2. Plaintiffs Have Pled a Primary Violation Based on Untrue Statement.* – It is also a violation of the TSA to "offer[] or sell[] a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to the make the statements made, in light of the circumstances under which they are made, not misleading." TEX. CIV. STAT. ART. 581-33A(2). Because this is a statute based on fraud, Plaintiffs must also meet the particularity standard of Rule 9(b). *See Rombach v. Chang,* 355 F.3d 164, (2d Cir. 2004) (stating that Rule 9(b)'s particularity requirement applies to securities claims brought under 15 U.S.C. § 77l); *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.,*

ORDER – PAGE 6

97 S.W.3d 779, 783 (Tex. App.— Dallas 2003), *rev'd on other grounds*, 161 S.W.3d 482 (Tex. 2005).

Plaintiffs have done this. They allege that Stanford and his affiliates misrepresented that the CD offering was exempt from registration. Further, they allege that Stanford made this representation "on a continuous basis from at least 2005 to 2008," and made the representation in SIB and SGC's "offering materials." These materials included "general public advertisements, publicly distributed magazine articles and other communications" as well as seminars and meetings. Finally, Plaintiffs allege what Stanford and his affiliates obtained: CD sales of approximately $7.2 billion. These facts sufficiently allege the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams*, 112 F.3d at 177. Accordingly, the Court finds that the complaint meets the requirements of Rule 9(b).

### B. Plaintiffs Have Sufficiently Pled Pershing's "Subjective Awareness"

The TSA requires that the aider and abettor possess a "general awareness that his role was part of an overall activity that is improper." *Adderley*, 168 S.W.3d at 840. The Court finds that Plaintiffs have sufficiently alleged this general awareness. The Complaint alleges that Pershing knew SIB sold $7.2 billion in CDs by advertising safe, secure, double-digit returns. The CDs, in fact, were not like those issued by U.S. banks; the CD proceeds were actually invested (to the extent not simply taken by Stanford) in speculative, illiquid, high-risk investments by a leveraged hedge fund. The Complaint further alleges that Pershing knew that SIB fabricated explanations for why these CDs yielded returns higher than those

ORDER – PAGE 7

of U.S. commercial bank CDs, and that Pershing expressed internal concerns about SIB's financial status. The Complaint also alleges that Pershing was aware that SIB was paying SGC and its brokers excessive compensation for the sale of the CDs. Yet still, according to Plaintiffs, Pershing continued to assist in the sales. The Court finds that the complaint sufficiently alleges Pershing's subjective awareness of Stanford and SIB's primary violation.

### C. Plaintiffs Have Sufficiently Pled that Pershing Rendered "Substantial Assistance"

In Texas, an aider is one who "materially aids a seller, buyer, or issuer of a security." Texas courts have interpreted this language, apparently tracking federal law, to impose liability on those who "substantially assist" a primary violation. *Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 720-721 (Tex. App. – Houston [14th Dist.] 2010, no pet.).

Plaintiffs allege that Pershing provided loan and margin financing to Stanford customers in exchange for interest payments. In providing such assistance, Plaintiffs allege that Pershing exercised professional expertise and judgment, motivated by its own financial interests, as well as the financial interests of the Stanford Defendants. Plaintiffs also allege that Pershing intended to lend its name and credibility to the Stanford operation by issuing various confirmations and statements to customers. That Court finds that these allegations sufficiently plead substantial assistance under Texas law.

Texas courts have not interpreted this substantial assistance requirement often. At least one court has stated that a failure to disclose, absent an elsewhere-arising duty, is insufficient to create liability. *See id.* Another found sufficient evidence of substantial assistance where the aider and abettor became CEO of the primary violator, told investors

ORDER – PAGE 8

he would make reports but failed to do so, and offered investors the opportunity to invest additional funds. *See Darocy v. Abildtrup*, 345 S.W.3d 129, 138 (Tex. App. – Dallas 2011, no pet.). Otherwise, the Court is left with only federal law and other states' case law interpreting similar statutes for guidance in interpreting the TSA's substantial assistance requirement.

Federal and other states' caselaw echos that a party is not liable under similar aiding and abetting provisions for a mere failure to disclose. *See, e.g., IIT v. Cornfeld*, 619 F.2d 909, 927 (2d Cir. 1980) ("[I]naction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act."); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 981 (N.Y. 2009). Further, a party does not substantially assist by engaging in only ministerial duties or routine services. *See, e.g., Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) (New York law); *Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 581-82 (5th Cir. 1988) (federal law); *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 600 (S.D. Ind. 2000) (collecting state-law cases). Given this persuasive-precedent framework, Pershing argues that Plaintiffs fail to state a required element of their claims because the complaint alleges only routine services.

The Court disagrees. Pershing argues that most or all clearing brokers engage in the types of financing described in Plaintiff's complaint. But a common service is not necessarily a routine or ministerial service. *See Oppenheimer & Co., Inc.*, 130 P.3d at 588 (holding that clearing broker materially aided securities law violation by providing financing to customers); *see also Clearer Skies for Investors: Clearing Firm Liability Under the Uniform Securities Act*, 39 SAN DIEGO L. REV. 1327, 1355 (Fall 2002) ("[Activities like

ORDER – PAGE 9

margin financing] may be the normal activities of the clearing firm acting in its professional role, but that does not make the activities any less material . . . ."). And although clearing brokers may often provide financing, different brokers could use different levels of discretion in making loans, or loan on different terms, depending on the particular broker-dealer and the particular security. The type of loan, the terms of the loan, and the level of discretion granted the clearing broker in granting the loan would all have some effect on the "substantial assistance" analysis.

The Court recognizes that other courts have found that routine financing, standing alone, is insufficient to show substantial assistance. *See, e.g.*, *Sigmundr Exploration Corp.*, 848 F.2d at 581-82. But here, Plaintiffs allege more than *routine* financing. Plaintiffs not only pled that Pershing engaged in financing to customers attempting to buy Stanford CDs but also that Pershing made assessments about *whether* to process orders and execute transactions. In making these decisions, Plaintiffs allege, Pershing used professional expertise and discretion. In exercising this discretion, Plaintiffs allege that Pershing was motivated not only by its own financial interests but also the financial interests of Stanford and his affiliates. Plaintiffs also allege that Pershing sought to intentionally lend credibility to the Stanford operation. These allegations would make Pershing's actions far more than routine. The Court thus finds these allegations sufficient to state a claim for substantial assistance.[6]

---

[6]In refusing to dismiss Plaintiffs' claim, the Court is also persuaded by the numerous state courts that consider the "substantial assistance" or "material aid" inquiry as a fact question, and thus usually inappropriate as a means for dismissal. *See Hirata Corp.*, 193 F.R.D. at 600 (collecting cases).

ORDER – PAGE 10

CONCLUSION

Plaintiffs have alleged sufficient facts to show that Stanford-affiliated parties were guilty of a primary violation of the TSA, that Pershing had "general knowledge" of the violation, and that Pershing substantially assisted the violation. Accordingly, the Court denies Pershing's motion to dismiss.

Signed November 14, 2012.

David C. Godbey
United States District Judge

ORDER -- PAGE 11

Case 2:15-cv-07820-SDW-LDW    Document 4-1    Filed 11/18/15    Page 69 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW    Document 1-5    Filed 10/30/15    Page 1 of 1 PageID: 59
147

# EXHIBIT E
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 4-1   Filed 11/18/15   Page 70 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW   Document 1-6   Filed 10/30/15   Page 1 of 1 PageID: 60
148

# EXHIBIT F
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 4-1   Filed 11/18/15   Page 71 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW   Document 1-7   Filed 10/30/15   Page 1 of 1 PageID: 61
149

# EXHIBIT G
# [REDACTED]

# EXHIBIT H
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW Document 4-1 Filed 11/18/15 Page 73 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW Document 1-9 Filed 10/30/15 Page 1 of 2 PageID: 65
151

From: Richard F. Brueckner <CEO@pershing.com>
Sent: 10/3/2008 7:31:07 PM +00:00
To: "Pickett, Randall C." <STANFORDEAGLE/SFG/RECIPIENTS/RPICKETT>
Subject: Pershing's Financial Position



Dear Advisor,

You may have received inquiries from investors about the strength of financial service providers as a result of the recent market turmoil. We are sharing the following information to help you respond to inquiries you may receive.

Pershing LLC (Pershing), and our parent company, The Bank of New York Mellon Corporation, remain in a strong financial position.

The following are some key facts and information about Pershing Advisor Solutions LLC, the broker-dealer for your Managed Account Link® accounts, and Pershing, the custodian for your accounts, both affiliates of Lockwood Advisors, Inc.:

- Pershing is the leading provider of clearing services to broker-dealers and also provides custody services to registered investment advisors and money managers.
- Pershing holds in custody approximately $934 billion of clients' assets globally on behalf of the financial institutions we serve (as of August 31, 2008).
- Pershing is well capitalized and our capital ratios exceed those required by regulators. (See www.pershing.com for Pershing's Statement of Financial Condition as of June 30, 2008.)
- Pershing Advisor Solutions and Pershing do not originate, underwrite, or proprietarily trade subprime securities, collateralized debt obligations, or mortgage-backed securities, and we are not a retail mortgage underwriter or residential lender.
- Clients' accounts held in custody at Pershing are protected by the Securities Investor Protection Corporation (SIPC) up to $500,000 of which $100,000 can be cash. (See www.sipc.org for additional information.)
- In addition to SIPC protection, Pershing has obtained additional protection for client assets in custody through an industry captive insurer, Customer Asset Protection Company, for the full net equity of your clients' holdings in excess of SIPC limits. (See www.capcoexcess.com for additional information.)
- Pershing segregates fully paid for securities on behalf of clients in accordance with industry rules and regulations.

Below are some key facts and information about our parent company, The Bank of New York Mellon Corporation, a leading global asset management and securities services firm:

- The Bank of New York Mellon ranks among the top large-cap financial services companies with a market capitalization of approximately $42 billion as of September 26, 2008. (See The Bank of New York Mellon's Second Quarter 2008 Financial Results for additional information.)
- The Bank of New York Mellon has more than $23 trillion in assets under custody.
- The Bank of New York Mellon does not underwrite or warehouse subprime securities or collateralized debt obligations.
- As of June 30, 2008, The Bank of New York Mellon holds $1.66 billion of subprime securities, and $79 million of collateralized debt obligations backed by subprime in its

CROWELL029241

Case 2:15-cv-07820-SDW-LDW   Document 4-1   Filed 11/18/15   Page 74 of 82 PageID:
Case 2:15-cv-07820-SDW-LDW   Document 1-9   Filed 10/30/15   Page 2 of 2 PageID: 54
152

investment securities portfolio. These amounts ($1.74 billion) represented only 4% of the total portfolio ($44.3 billion). The securities in The Bank of New York Mellon's core asset and mortgage-backed securities portfolio are highly rated with 93% rated AAA.

Pershing takes seriously our responsibilities to serve registered investment advisors, broker-dealers, and money managers, and to protect clients' assets. Despite the current market conditions, we believe we are in a strong position to continue to serve our customers well, as we have throughout our 70 year history.

We appreciate the trust and confidence you place in us and look forward to working with your practice for many years to come.

Best regards,



Richard F. Brueckner
Chairman and Chief Executive Officer
Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation.
One Pershing Plaza, Jersey City, New Jersey 07399

CROWELL029242

# EXHIBIT J
# [REDACTED]

# EXHIBIT K
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 1-12   Filed 10/30/15   Page 1 of 1 PageID: 67

# EXHIBIT L

# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 1-13   Filed 10/30/15   Page 1 of 1 PageID: 68

# EXHIBIT M
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 1-14   Filed 10/30/15   Page 1 of 1 PageID: 69

# EXHIBIT N
# [REDACTED]

# EXHIBIT O
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 1-16   Filed 10/30/15   Page 1 of 1 PageID: 71

# EXHIBIT P
# [REDACTED]

Case 2:15-cv-07820-SDW-LDW   Document 4-17   Filed 10/30/15   Page 1 of 1 PageID: 72

# EXHIBIT Q
# [REDACTED]